■ SHAUL CHAZON Individually and as Parent and Natural Guardian of ADAM CHAZON, an Infant, Respondent, v PARKWAY MEDICAL GROUP et al., Appellants, et al., Defendants.—In an action to recover damages for personal injuries resulting from medical malpractice, the defendants Parkway Medical Group, David Klebanow and Herbert Tetenbaum, appeal from a judgment of the Supreme Court, Kings County (Clemente, J.), entered May 22, 1989, which, upon a jury verdict finding that the plaintiff sustained damages of $4,283,000, and upon an order of the same court dated May 10, 1989, and a stipulation by the plaintiff to reduce the verdict as to damages to $2,496,000, is in favor of the plaintiff and against them in the principal sum of $2,496,000.

Ordered that the judgment is modified, on the law and the facts, by increasing the award of damages from the principal sum of $2,496,000 to the principal sum of $3,083,000; as so modified, the judgment is affirmed, with costs to the plaintiff, and the matter is remitted to the Supreme Court, Kings County, for the entry of an appropriate amended judgment.

The evidence adduced at the trial established that on May 5, 1978, the plaintiff Shaul Chazon's wife Sheri Chazon went to the appellant Parkway Medical Group, and consulted with the appellant Dr. David Klebanow, then a member of the group. She told him that her last menstrual period had occurred on March 31, 1978, and she was subsequently diagnosed as pregnant. Until January 1979 Mrs. Chazon's uneventful pregnancy was followed by Dr. Klebanow and the

appellant Dr. Herbert Tetenbaum, another member of the Parkway Medical Group. According to Dr. Klebanow's office notes, Mrs. Chazon's expected delivery date was on or about January 5, 1979.

Experts for both sides testified that the human placenta has a viable life of approximately 38 to 42 weeks. After 38 weeks, it tends to deteriorate, becoming progressively unable to supply nutrients and oxygen to the fetus it is supposed to nourish. In 1979, good obstetrical practice required the physician (1) to be aware of how long his patient had been pregnant, and (2) to perform estriol tests and oxytocin challenge (hereinafter OCT) tests on her after the forty-second week, to evaluate placental function and to see if the fetus was in distress because of lack of nutrients and/or oxygen. If these latter tests did not "assure" the doctor that the baby was "okay", labor should have been promptly induced or a Caesarian section performed, to obviate serious damage to the infant.

On January 18, 1979, when Mrs. Chazon had still not gone into labor, Dr. Klebanow ordered estriol and OCT tests. Despite the fact that the results of the test performed on January 23 were not reassuring and the results of the test performed on January 26 were "suspicious", he did not perform a Caesarian section until January 29, 1979. The child, Adam, born in Chazon's forty-fourth week of pregnancy, was severely brain damaged from hypoxia (lack of oxygen), retarded, paralyzed, and both hypotonic and spastic (i.e., afflicted with cerebral palsy).

The jury returned a verdict in favor of the plaintiff individually and as the parent and natural guardian of Adam, in the principal sum of $4,283,000, which the trial court reduced to the principal sum of $2,496,000.

The appellants contend, *inter alia,* that the trial court failed to properly relate the facts of the case to the parties' contentions, failed to properly instruct the jury on proximate cause, and submitted a misleading verdict sheet to the jury. They also argue that the testimony of the plaintiff's expert witnesses was inadequate and should have been stricken, and that the verdict was excessive. The appellants' contentions are without merit.

In the first instance, at no time did counsel for the appellants complain, in time for the trial court to cure the alleged defect, that the evidence had not been adequately marshaled, that the contentions read to the jury (in the precise form drafted and requested by their counsel) were unsatisfactory, or

that there was anything wrong with the verdict sheet. In consequence, these issues are unpreserved for this court's review *(cf., Knobloch v Royal Globe Ins. Co.,* 38 NY2d 471; *Noga v Monroe Medi-Trans,* 78 AD2d 988). In any event, the court's charge, including its instruction on proximate cause, was in all respects proper, and adequately related the applicable principles of law to the parties' factual contentions *(cf., Green v Downs,* 27 NY2d 205; *Bender v Nassau Hosp.,* 99 AD2d 744; *Quigley v County of Suffolk,* 75 AD2d 888; *Anchor Motor Frgt. v Shapiro,* 56 AD2d 573). Nor was the verdict sheet in any way misleading.

The appellants similarly failed to preserve their objections to the testimony of the plaintiff's expert witnesses. In any event, the plaintiff's expert perinatologist, Dr. David Abramson, was well qualified to testify as to Adam's condition, and his conclusion that Adam suffered from cerebral palsy caused by intrauterine asphyxia was corroborated by the record as a whole. When Dr. Abramson's competent testimony, coupled with the rest of the evidence, is viewed in the light most favorable to the plaintiff, resolving all questions of credibility in the plaintiff's favor *(see, Alberti v St John's Episcopal Hospital-Smithtown,* 116 AD2d 612), it is apparent that a reasonable jury could conclude that Dr. Klebanow departed from reasonable standards of obstetrical care in the community in not delivering Adam before January 29, 1979, and that these departures were a proximate cause of Adam's injuries.

The plaintiffs' expert obstetrician and gynecologist Dr. Jay Kelinson testified that Dr. Klebanow's treatment departed from accepted standards of obstetrical care, but did not give testimony as to proximate cause. Since Dr. Abramson's testimony had established that Dr. Klebanow's delay in delivering Adam, despite the overdue pregnancy and a "suspicious" OCT test, had caused the child's condition, Dr. Kelinson was not required to duplicate such testimony. In any event, he claimed such testimony was beyond his area of expertise.

CPLR 5501 (a) (5) vests this court with authority to review the amount of and increase or reduce a "final judgment [which] was entered in a different amount pursuant to the respondent's stipulation on a motion to set aside the verdict as excessive or inadequate" *(see, Donohoe v Goldner,* 168 AD2d 412; 7 Weinstein-Korn-Miller, NY Prac ¶ 5501.13; *cf., Martinez v Long Is. Jewish-Hillside Med. Center,* 133 AD2d 264). In the matter at bar, the appellants failed to rebut the calculation of the plaintiff's economist that, had Adam graduated from high school and lived a normal life, he

would have earned a total of $1,210,090 *(cf., Kavanaugh v Nussbaum,* 129 AD2d 559, 563, *mod* 71 NY2d 535). The record therefore supports the jury's determination that Adam's earning ability had been impaired to the extent of $1,174,000, and the trial court's determination that that portion of the verdict was excessive was erroneous. The appellants' remaining contentions with respect to damages are without merit. Lawrence, J. P., Kooper and Sullivan, JJ., concur.

Rosenblatt, J., concurs in part and dissents in part, and votes to affirm the judgment appealed from, with the following memorandum: I dissent from the majority decision to the extent that I believe the Supreme Court properly exercised its discretion when it determined that the jury verdict for impairment of earning ability of $1,174,000 was excessive and should be reduced to $587,000.